Charles F. Miller, Appellee, v. St. Louis, Springfield & Peoria Railroad Company, Appellant.

1. RELEASE—*burden of proving fraud.* In an action for personal injuries received by plaintiff while a passenger on defendant road, where defendant produces a release signed by plaintiff, the plaintiff who claims the release was procured by fraud has the burden of proof.

2. RELEASE—*ratification.* Where plaintiff, after signing a release of all claims for damages resulting from injuries received while a passenger on defendant road, cashed a draft given in settlement, he thereby ratified the settlement.

3. RELEASE—*effect.* In a personal injury action where a clear preponderance of the evidence shows that there was no fraud in procuring a release of all claims for damages signed by the plaintiff when he was mentally competent to transact business, and that he cashed a draft given in full settlement, the judgment for damages will be reversed.

Appeal from the Circuit Court of Sangamon county; the Hon. JAMES A. CREIGHTON, Judge, presiding. Heard in this court at the April term, 1912. Reversed with finding of fact. Opinion filed October 15, 1912.

GRAHAM & GRAHAM and H. C. DILLON, for appellant; GEORGE W. BURTON, of counsel.

ALBERT SALZENSTEIN and WEIL & BARTLEY, for appellee.

MR. PRESIDING JUSTICE THOMPSON delivered the opinion of the court.

The appellee recovered a verdict and judgment for $1,615 in a suit brought by him against the appellant

for damages received by appellee, while he was a passenger on a car of appellant near Staunton, Illinois, on October 4, 1910.

Appellant introduced in evidence a release executed by appellee for $215 on October 8, 1910, releasing appellant from all claims for damages, and also a draft dated October 8, 1910, payable to the order of Charles F. Miller for $215 which recites that it is in full settlement for all claims or damages to his person and property resulting from an accident on the St. Louis, Springfield and Peoria Railroad on the fourth day of October, 1910. This draft was cashed by the Granite City Bank and the proceeds were received by appellee on October 15, 1910.

It is contended by appellee that the release was secured by fraud, in that the appellee procured the execution of the release at a time when he was mentally incompetent to execute it, and did not know what he was doing at the time.

Appellee was injured between 3 and 4 o'clock in the afternoon in a collision. He was placed on a relief train and taken to the Granite City Lutheran Hospital, some twenty miles distant from the scene of the accident. While on the way to the hospital about the middle of the trip, he was weak and faint and was given some brandy and a hypodermic injection of strychnine and morphine by Dr. Hunter. His injuries consisted of a broken rib—the fifth or sixth on the left side—a fracture of the collar bone on the same side, and many bruises on his body. Dr. Hunter treated his wounds at the hospital that evening. He was not giving any other hypodermic injection. Dr. Hunter did not treat the appellee after the first evening and was asked no question about his mental condition, but testified that he was weak, faint, and suffering pain.

Appellee testified that on October 8th, two men, C. H. McLaughlin and R. F. Anderson, introduced themselves to him at the hospital, gave him their card,

talked to him about the accident and said they would like to adjust the matter; that he told them he was not in any condition to talk business and not to bother him; that they went away and came back that same day after dinner and started talking in the same line, but he remembers nothing more; that he does not remember signing the release, although part of the signature looks like this, but he cannot state whether it is or is not his signature; that he does not remember ever seeing the release until during the trial; that he did not remember seeing the draft until during the trial although the signature on the back of it looks like his and he thinks it is his. Frank C. Miller, a locomotive engineer, who had attended high school and is a son of appellee, testified that he was in his father's room in the hospital in the forenoon of October 8th when a man, that he recognizes as McLaughlin, came and talked to his father about an hour, but that he did not hear the conversation; that this man and another man came back in the afternoon between 2:30 and 3 o'clock and talked to his father, but he did not hear the conversation; that his father was sitting in a chair; that these men called the attention of the witness to a paper, threw it down on the bed, asked him to sign it and he signed it. He testified the paper was not read and nothing was said about what it contained; that he did not talk much to his father because he was too excited to talk, and that his father was mentally unfit to transact business.

J. G. Pressley, a bus driver, testified that he talked with appellee about ten minutes, when he was sitting in a chair after 4 o'clock on the afternoon of October 8th, and that appellee seemed excited in talking about the wreck. Dr. Simpson, a dentist, and T. B. Stevens, who is in the loan association business, testified that they talked with appellee on October 10th, about fifteen minutes and that he became excited and "any questions asked were hardly answered intelligently." George Sinnegar testified that he talked with

appellee an hour and a half on October 15th, and he seemed very nervous and gave a disconnected account of the wreck. This is substantially all the evidence on behalf of appellee attacking the release.

To sustain the release, R. F. Anderson and C. H. McLaughlin, attorneys for appellant, who were present when the release was signed, testified that at the time it was signed they talked with appellee from thirty minutes to an hour; that he discussed the accident and his income with them; that he said the doctor had told him he would be around in three or four weeks; that he talked about his suffering and they all agreed money would not compensate him for his suffering and that $175 to $180 would compensate him for his loss of time and personal effects; that after a settlement for two hundred dollars was suggested appellee thought he ought to have a 1,000 mile book, and was told that would have to come through a different department; that he said such a book would cost fifteen dollars, and they agreed then on a settlement for $215, the appellant also to pay all his hospital and medical expenses; that the release and draft were drawn on that basis and the release was read to appellee in the presence of his son; that appellee stated to his son if he signed the paper it would end the matter, and the son said that it was for him to use his own judgment, and that appellee signed the release and the son signed it as a witness. These witnesses testified to the conversation and that he was rational and neither nervous nor excited. Miss Neubarth and Miss Cutcamp, two experienced day nurses at the hospital, testified that they saw appellee several times every day after he was injured; that they talked with him and heard him talk, waited on him, washed him and took his meals to him; they both testified that he was of a jovial disposition and always rational and intelligent.

Dr. Scott saw appellee October 4th and assisted Dr. Hunter in bandaging appellee and saw him and talked

with him daily thereafter. He testified that appellee was always rational and talked intelligently and gives the general tenor of his conversations. Dr. Lindquist saw and talked with appellee at the hospital on October 5th and 11th; he testified that appellee was rational and possessed all his faculties, and that the effect of the hypodermic injection would last three or four hours.

H. C. White, claim agent for appellant, testified that on October 11th, he went to the hosiptal to see another party and that he talked with appellee at that time; that appellee told him he had settled his claim and gave him the details of it and said that he had been fairly treated. He also testified that in February, 1911, at the Meyer hotel in Peoria, appellee told him he did not think he had got enough money out of the settlement and that others got a good deal more; that he had settled, but that he thought if he could see McKinley personally he would pay him more. On October 15th, appellee sent one Howard, an employee of the pospital who could not be found at the time of the trial, to the bank to cash the draft. Howard was a stranger to the bank and the bank required him to be identified. Dr. R. D. Luster was in the bank at the time, and knew Howard as an employee at the hospital; he declined to indorse the draft but said he was on his way to the hospital and would see that appellee got the money. He drove with Howard to the hospital and saw appellee walking around in the hall, talked with him, saw him count the money when it was handed to him and says his mind was perfectly normal at the time.

The hospital record kept in the daytime by Miss Neubarth and Miss Cutcamp, and at night by another nurse, was introduced in evidence without objection. It shows that appellee had light diet and was restless October 4th, 5th, and 6th, but after that time he ate and slept well from that time until he was discharged from the hospital on the eighteenth, and that on the

day the release was executed his pulse and temperature were normal, and that he had taken no medicine and was on a general diet.

The original bill of exceptions was by agreement made a part of the record in this court. The original release and draft are a part of the bill of exceptions and this court has the benefit of their inspection. The release is on a printed form, the body of which is all either in ordinary long primer Roman type print or typewriting, except the amount paid, the date, and the signatures of appellee and the witnesses, which are in writing. At the top of it is printed in eighteen point, heavy face, Gothic capital letters, nearly a quarter of an inch in height in very bright red ink, the words "Release of all claims and damages." The remainder of the release is in black ink. This red heading is the most striking print on the release and attracts the eye at a glance. Frank C. Miller and Anderson and McLaughlin signed it as witnesses to the signature of appellee; beneath the signature of appellee is a certificate signed by them containing the statement that it was read in the presence of appellee and that he understood and knew that he was signing away his right to any claim for injuries.

The draft is on a printed form filled in in writing and has in the center of it a line in ten point, full face, Gothic capital type, being very black letters the words: "In full settlement for all claims or damages to" his person or property. This draft was accepted and retained with the notice on the draft that it was a settlement of his claim. By cashing the draft and keeping the proceeds he also ratified the settlement.

The son of appellee, who signed as a witness to the release, is an educated man of ordinary intelligence with all his faculties. The release was signed and the conversations concerning it with appellee were held in a room about ten by twelve feet. The son was in the room while the writing was being filled in, and while the settlement was under discussion. It is in-

credible that he could sign, as a witness, a release with this red letter heading to it without seeing the heading, which is as prominent and striking as a locomotive headlight in the night time. It is also incredible, if his father was in the condition he says he was, that he should permit strangers to talk to him the length of time he says McLaughlin and Anderson talked to his father. The evidence of the nurses and the record shows clearly that appellee was fully competent to transact business.

The draft which had a distinct notice on its face of what it was given for was held by appellee a week and then was indorsed and cashed only three days before he was discharged from the hospital and the proceeds retained. The burden was on the appellee to prove fraud in procuring the execution of the release. The manifest and very clear preponderance of the evidence shows that there was no fraud in the procuring the execution of the release and that it is a valid defense to this action.

It is unnecessary to review the other assignments of error. The judgment is reversed with a finding of fact.

*Reversed.*

Finding of fact: There was no fraud in the procuring the execution of the release offered in evidence; the appellee was mentally competent to transact business when the release was executed and appellee also ratified the release by cashing the draft with notice that it was given for a release, and retaining the proceeds.